UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| WILLIAM PENDLETON, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:20-cv-00489-JPH-TAB |
| | ) | |
| MICHAEL MURPHY, et al. | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

William Pendleton and Antoine Banks allege that Indiana University
Health police officers unlawfully stopped, searched, and detained them, and
then wrongfully had them excluded from the Indiana University Health facility
where they had job assignments as contract workers.  They bring state and
federal claims against the individual officers and their employer, Indiana
University Health, Inc.  Defendants have moved for summary judgment on all
claims.  Dkt. [45].  For the reasons that follow, that motion is **GRANTED in
part and DENIED in part**.

## I.
### Facts and Background

Because Defendants have moved for summary judgment under Rule
56(a), the Court views and recites the evidence "in the light most favorable to
the non-moving party and draw[s] all reasonable inferences in that party's
favor." *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).

### A. The Parties

Indiana University Health, Inc. is a private, non-profit network of hospitals headquartered in Indianapolis, Indiana.  Dkt. 46-1.  At all relevant times, Robert Dycus, Kenneth White, and Michael Murphy were employed as officers in the IU Health Police Department.  Dkt. 46-2 at 1 (Dycus Aff. ¶ 1); dkt. 46-3 at 1 (Murphy Aff. ¶ 1–2); dkt. 46-4 at 1 (White Aff. ¶ 1).

In January 2020, Antoine Banks and William Pendleton worked for Executive Management Services, Inc. (EMS), a commercial contract cleaning company.  Dkt. 46-5 ¶¶ 1–2 (Sells Aff.).  IU Health's principal office in Indianapolis—Fairbanks Hall—is an EMS contract client.  Dkt. 46-1; dkt. 46-6 at 2, 12 (Bigelow Aff. Ex. A: EMS Service Contract).  EMS employees who are assigned to provide services at IU Health are required to obtain an IU Health identification badge and "affix [it] to their clothing so that it is clearly visible at all times" while at an IU Health facility.  Dkt. 46-6 at 22 (Bigelow Aff. Ex. A: EMS Service Contract).

Both Mr. Banks and Mr. Pendleton were assigned weekday shifts at Fairbanks Hall, with Mr. Banks's shift running from 3:30 to 11:30 p.m., and Mr. Pendleton's from 5:30 to 10:30 p.m.  Dkt. 46-8 at 36 (Banks Dep. Ex. 2); dkt. 46-7 at 45 (Pendleton Dep. Ex. 2).  Mr. Banks was Mr. Pendleton's on-site supervisor.  Dkt. 46-7 at 11 (Pendleton Dep. at 41).

Charlotte Sells is an Operations Manager for EMS.  Dkt. 46-5 ¶ 1, 3.  In 2019 and 2020, she was responsible for hiring and firing EMS janitors and placing them with EMS customers.  *Id.* ¶ 4–5.  As the EMS representative

assigned to provide cleaning and facilities services for IU Health's Fairbanks

Hall, she was the off-site supervisor for Mr. Pendleton and Mr. Banks. *Id.* ¶¶

5–6; dkt. 46-8 at 11, 23 (Banks Dep. at 42, 89).

### B. Background of the Incident

On January 10, 2020, Mr. Pendleton arrived late for his shift at

Fairbanks Hall around 6:40 p.m. Dkt. 46-7 at 11 (Pendleton Dep. at 41); dkt.

49 (Ex. 1 video 1).[1] Because he had been recently hired, Mr. Pendleton did not

have an IU badge or keys to the building. Dkt. 46-7 at 8, 13 (Pendleton Dep at

29–30, 49); dkt. 46-8 at 15 (Banks Dep. at 59). Mr. Banks let Mr. Pendleton in

at the back of the building and gave him a key to the second floor. Dkt. 46-7 at

13 (Pendleton Dep at 49); dkt. 46-8 at 15 (Banks Dep. at 58–60); dkt. 49 (Ex. 1

video 1, at 1:05). During the exchange, Mr. Banks complimented Mr.

Pendleton's clothes, stating "You are fresh as hell." Dkt. 46-8 at 16 (Banks

Dep. at 61–62). Mr. Banks then left the building on break, and Mr. Pendleton

started cleaning the second floor. *Id.* (Banks Dep. at 62–63); dkt. 46-7 at 14

(Pendleton Dep. at 54–55).

Meanwhile, around 7:00 p.m., Lt. Dycus reported to the IU Health

dispatch center in response to a request from one of its operators, Lashanda

Macon. Dkt. 46-2 at 1 (Dycus Aff. ¶ 2). Ms. Macon informed him that she "had

seen something suspicious" in the security video feed from Fairbanks Hall. *Id.*

---

[1] Exhibit 1 to docket 49 contains two video clips, one beginning at 1839 hours and one beginning at 1943 hours. The video beginning at 1839 hours will be cited as "Dkt. 49 (Ex. 1 video 1 . . .") and the video beginning at 1943 hours will be cited as "Dkt. 49 (Ex. 1 video 2 . . .").

¶ 3.  Lt. Dycus reviewed the footage and saw "a hand-to-hand exchange of a small item between two men . . . wearing street clothes and ball caps."  *Id.* ¶ 4; *see also* dkt. 49 (Ex. 1 video 1).  Ms. Macon also told him that she heard, through an open intercom line, the comment: "That's fat as hell," which she believed may have been a reference to drugs.  Dkt. 46-2 at 2 (Dycus Aff. ¶¶ 5–6).

Based on what he saw and heard, Lt. Dycus was suspicious that the two men had exchanged drugs.  *Id.* ¶¶ 7–10.  Ms. Macon told Lt. Dycus that she recognized one of the men as a janitor, but Lt. Dycus had never seen either man.  *Id.* at 3, ¶ 12.  He found it suspicious that they were on the loading dock of Fairbanks Hall at that time of night because they looked like members of the general public.  *Id.*  Lt. Dycus contacted Officer Murphy and Sgt. White and informed them of the situation and his suspicion.  *Id.* at 4, ¶¶ 17–19.  Lt. Dycus, Officer Murphy, and Sgt. White met at Fairbanks Hall around 7:30 p.m. *Id.* ¶ 21.

The officers walked through the building and exited out back to the loading docks.  *Id.* ¶ 22.  They approached a gold SUV in the parking lot to check if it had an IU Health parking permit because they thought they could identify the men in the video by searching the IU Health parking database.  *Id.* ¶¶ 23–24.  As they approached the vehicle, Lt. Dycus and Officer Murphy "smelled the distinctive odor of marijuana coming from the vehicle."  *Id.* ¶ 25; dkt. 46-3 at 3 (Murphy Aff. ¶ 15).

Around this time, Mr. Banks received a phone call from another EMS employee informing him that there were police officers at Fairbanks Hall.  Dkt. 53-2 at 16 (Banks Dep. at 63–64).  Mr. Banks, still away on break, called Mr. Pendleton and suggested that he speak with the officers to find out why they were there.  *Id.* at 16 (Banks Dep. at 68–69).  Mr. Pendleton was cleaning and collecting trash at the time, so he went to the loading docks to take out the trash and speak with the officers.  Dkt. 53-3 at 14 (Pendleton Dep. at 55).

### C. The Incident

 At approximately 7:45 p.m., Mr. Pendleton was throwing trash into a dumpster behind Fairbanks Hall when Officer Murphy asked him to identify himself.  *Id.* (Pendleton Dep. at 56); dkt. 49 (Ex. 1 video 2 at 0:38–0:55).  Mr. Pendleton responded by showing his EMS badge.[2]  Dkt. 53-3 at 14 (Pendleton Dep. at 56).  Officer Murphy then stated: "I need to pat you down for our safety," and Mr. Pendleton responded "okay" and put his hands against the wall.  *Id.* at 14–15, 19 (Pendleton Dep. at 56–57, 74–75); dkt. 46-3 at 3 (Murphy Aff. ¶ 19).  Officer Murphy frisked Mr. Pendleton and found nothing of note.  Dkt. 46-11 at 5 (Murphy Dep. at 17).

During the pat-down, Officer Murphy asked Mr. Pendleton about drugs, and Mr. Pendleton denied having any.  Dkt. 53-3 at 15 (Pendleton Dep. at 57).  Officer Murphy then showed him a photograph of the exchange on the loading docks, and Mr. Pendleton explained that Mr. Banks had given him a key.  *Id.*  Officer Murphy replied, "No. Where are the drugs at? We know that is what you

---

[2] Mr. Pendleton's EMS badge is separate and distinct from an IU Health badge.

people do." *Id.* Offended, Mr. Pendleton said he was going to call a friend who was the assistant police chief for the Southport Police Department. *Id.* (Pendleton Dep. at 57–58). Officer Murphy described Mr. Pendleton's behavior as "loud and angry." Dkt. 46-3 at 4 (Murphy Aff. ¶ 21). The officers then asked to search his jacket and locker, and Mr. Pendleton replied: "Go ahead." Dkt. 46-7 at 15 (Pendleton Dep. at 58).

The officers told Mr. Pendleton to call Mr. Banks and ask him to return to Fairbanks Hall. Dkt. 43-3 at 4 (Murphy Aff. ¶ 22); dkt. 53-4 at 9 (Dycus Dep. at 30–31). The officers then directed Mr. Pendleton to a storage room where they searched his jacket and other personal items. *Id.* at 23–24 (Pendleton Dep. at 92–94); *see* dkt. 49 (Ex. 10, video of storage room). At this point, Mr. Pendleton was "pretty fed up with the situation" because he felt the officers were "going too far." Dkt. 46-7 at 27 (Pendleton Dep. at 105–06).

After moving to the storage room, Officer Murphy asked who the gold SUV parked by the loading dock belonged to; Mr. Pendleton replied that it belonged to his child's mother and that he had driven it to Fairbanks Hall that evening. *Id.* at 25 (Pendleton Dep. at 98-99); dkt. 46-3 at 4 (Murphy Aff. ¶ 26). Because the officers had smelled marijuana near the vehicle, they contacted the Indianapolis Metropolitan Police Department (IMPD) to request the assistance of a K-9 officer. Dkt. 46-3 at 4 (Murphy Aff. ¶ 27); dkt. 46-7 at 15, 25 (Pendleton Dep at 58–59, 97–99). Officer Murphy and Lt. Dycus exited the storage room to contact IMPD and directed Sgt. White to stand at the door of the room, "keeping [Mr. Pendleton] there." Dkt. 46-10 at 4–5 (White Dep. at

6

13–14); dkt. 46-7 at 25 (Pendleton Dep. at 97–100).  Lt. Dycus called in the
request around 8:00 p.m. and was advised five minutes later that IMPD could
not send a dog.  Dkt. 46-3 at 5 (Murphy Aff. ¶ 28).  Mr. Pendleton remained in
the storage room waiting for Mr. Banks.  Dkt. 46-10 at 4–5 (White Dep. at 13–
14).

### D. Mr. Banks's Arrival

Mr. Banks returned to Fairbanks Hall around 8:15 p.m., roughly a half-
hour after Mr. Pendleton asked him to return.  Dkt. 46-3 at 5 (Murphy Aff. ¶
29).  The officers recognized Mr. Banks from the security footage and were
surprised to learn that he was Mr. Pendleton's supervisor.[3]  *Id.* ¶ 30.  Officer
Murphy told Mr. Banks that he needed to or was going to search him.  Dkt. 46-
8 at 19 (Banks Dep. at 75); dkt. 46-3 at 6 (Murphy Aff. ¶ 31). In response, Mr.
Banks said "okay" or "no problem," or otherwise indicated that he would
comply.  Dkt. 46-3 at 6 (Murphy Aff. ¶ 31).  Mr. Banks was frisked against the
exterior wall of Fairbanks Hall and then brought inside the building.  Dkt. 46-8
at 22 (Banks Dep. at 88); dkt. 46-3 at 6 (Murphy Aff. ¶ 32–33).  The officers
asked Mr. Banks about the exchange on the loading docks, and he explained
that he passed Mr. Pendleton a key.  Dkt. 46-8 at 22 (Banks Dep. at 85).

The officers then asked to speak with an off-site supervisor.  Dkt. 46-3 at
6 (Murphy Aff. ¶ 35).  Lt. Dycus spoke to Ms. Sells on Mr. Banks's phone and
told her that Mr. Pendleton "should be sent home for the evening to cool down,"

---

[3] Mr. Banks did not have an IU Health Badge because he lost it.  Dkt. 46-8 at 11
(Banks Dep. at 42).

but Mr. Banks was permitted to stay. *Id.*; dkt. 46-8 at 23 (Banks Dep. at 89–90). After the call, the officers concluded their investigation and told Mr. Pendleton to leave Fairbanks Hall because of his "loud and angry" behavior. Dkt. 46-3 at 6–7 (Murphy Aff. ¶¶ 35–37). Officer Murphy also told Mr. Pendleton he was "no longer welcome back on IU property." Dkt. 46-7 at 30 (Pendleton Dep. at 117–18). Mr. Pendleton told the officers that they wrongly accused him and Mr. Banks of dealing drugs when they were just trying to work. *Id.* (Pendleton Dep. at 119–20). Mr. Pendleton told the officers that they had gone too far, they hadn't found anything, and that he was not going to let this go. *Id.* The officers threatened to arrest him for trespass, so he left around 8:30 p.m. *Id.*; dkt. 46-3 at 7 (Murphy Aff. ¶¶ 40–41). Mr. Banks stayed and finished his shift. *Id.* ¶ 42.

### E. Post-Incident

Later that evening, Lt. Dycus placed a second call to Ms. Sells and informed her that he "thought it would be best if neither man continued to work in IU Health's buildings." Dkt. 46-2 at 12 (Dycus Aff. ¶ 67). He did so based on several factors, including his "lingering uncertainty about what happened on the loading dock that night" and because Ms. Macon told him that she had previously seen Mr. Banks receive personal visitors at Fairbanks Hall during the late-night part of his shift. *Id.* at 10–12 (Dycus Aff. ¶¶ 58–68).

The following Monday, Ms. Sells texted Mr. Banks that he could not return to IU Health, and he was transferred to a different EMS customer

location.  Dkt. 46-8 at 29, 37 (Banks Dep. at 113–14, Ex. 2).  Mr. Banks

remains employed by EMS.  *Id.* at 3 (Banks Dep. at 11).

EMS offered Mr. Pendleton a new job assignment and told him that he

would have the same pay, hours, and work schedule.  Dkt. 46-5 at 2 (Sells Aff.

¶¶ 7–10).  But Mr. Pendleton could not accept the new position because it was

a day-shift position and he had already had a day job.  Dkt. 53-1 at 2

(Pendleton Aff. ¶¶ 13–18).

Ten days after the incident, Plaintiffs' counsel asked IU Health to

"preserve . . . [a]ll video, audio, or still recordings captured" at Fairbanks Hall

on January 10.  Dkt. 53-8 at 16.  Lt. Dycus had already preserved some

portions of security footage for his police report, but he did not learn of

Plaintiffs' preservation letter until after IU Health's security system had

automatically deleted the rest of the video footage from that evening.  Dkt. 53-4

at 9 (Dycus Dep. at 32–33); dkt. 49 (Ex. 1).

On February 12, 2020, Mr. Banks and Mr. Pendleton filed this lawsuit

against IU Health, Lt. Dycus, Sgt. White, and Officer Murphy.  Dkt. 1; *see also*

dkt. 33 (second amended Complaint).   Mr. Pendleton and Mr. Banks bring

federal claims under 42 U.S.C. § 1983 alleging that the officers unlawfully

searched, frisked, and detained them in violation of the Fourth Amendment

and retaliated against them in violation of the First Amendment.  Dkt. 33 at 8–

11.  They also bring state law claims against the officers and IU Health for

tortious interference with a business relationship and unlawful spoliation of

evidence.[4]  *Id.*  Defendants have moved for summary judgment on all claims. Dkt. 45.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial."  *Id.* at 324.

In ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante*, 555 F.3d at 584 (citation omitted).

Indiana law governs Plaintiffs' state law claim for tortious interference with a business relationship.  *See Webber v. Butner*, 923 F.3d 479, 480–81 (7th Cir. 2019).  Therefore, the Court "must apply Indiana law by doing [its] best to predict how the Indiana Supreme Court would decide" issues related to that claim.  *Id.* at 482.

---

[4] Plaintiffs have conceded that spoliation of evidence is not a cognizable tort claim under Indiana law. Dkt. 54 at 34. Defendants' motion for summary judgment on this claim is therefore **granted**.

## III.
## Analysis

### A. Qualified Immunity

Officers Dycus, White, and Murphy argue that they are entitled to qualified immunity as a defense to Plaintiffs' constitutional claims. Dkt. 48 at 27–29, 33. Plaintiffs respond that the officers cannot assert qualified immunity because they are employees of a private hospital. Dkt. 54 at 20 (citing *Richardson v. McKnight*, 521 U.S. 399, 404 (1997) (holding that prison guards for privately owned prison could not assert qualified immunity against § 1983 claims)).

In some circumstances, private actors may assert the defense of qualified immunity, *Meadows v. Rockford Hous. Auth.*, 861 F.3d 672, 676–78 (7th Cir. 2017); *Filarsky v. Delia*, 566 U.S. 377, 393–94 (2012), but there is no categorical rule regarding whether officers employed by a private entity are entitled to raise qualified immunity as a defense. *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623, 627–31 (7th Cir. 1999), reaffirmed and explained why private actors with essentially the same powers as a public police officer can be held liable under § 1983. But it did not determine whether those private police officers could raise qualified immunity as a defense. Instead, it remanded the case to the district court with instructions to answer that question by considering the factors identified by the Supreme Court in *Richardson*: whether a history of immunity for private actors exists and

relevant public policy considerations. *Id.* at 631 (citing *Richardson*, 521 U.S. at 404).

On remand, the district court first noted the lack of "any relevant historical evidence regarding immunity conferred on special police." *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 82 F. Supp. 2d 901, 906 (N.D. Ill. 2000). Next, the court found that "[o]rdinary marketplace pressures [were] present in [that] case as they were in *Richardson*" because "the behavior of not-for-profit hospitals is similar to that of for-profits" and "the hospital independently employ[ed] and supervise[d] the special police . . . 'with relatively less ongoing direct government supervision.'" *Id.* at 906–07 (quoting *Richardson*, 521 U.S. at 410). Thus, the court concluded that the "defendants [were] not entitled to qualified immunity." *Id.* at 907. *See also Johnson v. Cmty. Hosp. Anderson/Madison Cnty.*, No. 1:20-cv-00855, 2022 WL 900021, at *12–13 (S.D. Ind. March 28, 2022) (reaching the same conclusion based on similar reasoning as *Peyton*).

Here, the officers have not cited precedent that would require the Court to find that they are entitled to assert the defense of qualified immunity. *See* dkt. 57 at 17–19. Nor have they cited a historical basis of immunity for private police officers. *Id.* Rather, the officers argue that various public policy considerations support the availability of qualified immunity, including: 1) the IU Health Police Department was authorized by statute to enforce the laws of the state of Indiana and was granted "the same common law and statutory powers, privileges, and immunities as sheriffs and constables"; 2) the officers

were trained and certified by the Indiana Law Enforcement Academy; 3) IU Health is a non-profit healthcare system; and 4) the officers perform police work that is a "traditional government function." *Id.*

These facts are relevant to why the officers are considered state actors whose conduct is within the scope of § 1983. But the ability to raise the defense of qualified immunity is not coextensive with the reach of § 1983; the latter is broader. *See Payton*, 184 F.3d at 628–32 (discussing circumstances under which a private party may be held responsible as a state actor under § 1983 and the factors to be considered in evaluating whether a private party may assert qualified immunity as a defense).

Here, the relevant factors do not support finding that the IU Health officers may assert qualified immunity. The officers may perform the "traditional government function" of police officers, but they do not work for or at the direction of a government body. *Cf. Filarsky*, 566 U.S. at 393–94; *Meadows*, 861 F.3d at 678. Instead, they work "independently, with relatively less ongoing direct state supervision," for a large, private network of hospitals. *Richardson*, 521 U.S. at 409. And while IU Health is a not-for-profit hospital, it is still subject to competitive market pressure. *See Payton*, 82 F. Supp. 2d at 906. Last, unlike local law enforcement agencies, IU Health has a commercial incentive to provide safe and hospitable health care to its customers. *Cf. Richardson*, 521 U.S. at 409.

The officers have not shown that they are entitled to raise qualified immunity as a defense against Plaintiffs' constitutional claims.

### B. Fourth Amendment Claims

The officers argue that they are entitled to summary judgment on Plaintiffs' Fourth Amendment claim because they had reasonable suspicion to stop, frisk, and detain Plaintiffs. Dkt. 48 at 19–27. Plaintiffs respond that the officers lacked reasonable suspicion, and regardless, the duration and scope of the detention exceeded the bounds of a lawful *Terry* stop. Dkt. 54 at 9–20; *see Terry v. Ohio*, 392 U.S. 1 (1968).

"Under *Terry v. Ohio*, law enforcement officers may conduct brief investigatory stops if they have reasonable suspicion that a person is engaged in criminal activity." *United States v. Smith*, 32 F.4th 638, 641 (7th Cir. 2022) (citations omitted). Each action taken by an officer during a *Terry* stop must be supported by reasonable suspicion. *See id.* at 641–43 (affirming legality of officer's decision to frisk a suspect three times after analyzing whether there was independent reasonable suspicion to conduct each frisk).

"Reasonable suspicion must account for the totality of the circumstances and requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Id.* (quoting *United States v. Reedy*, 989 F.3d 548, 552 (7th Cir. 2021)). For a *Terry* stop to be legal, "the investigation following it must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance." *Reedy*, 989 F.3d at 552.

14

### 1. Initial Stop of Pendleton and Banks

The officers argue that the totality of the circumstances presented

specific and articulable facts that justified the initial *Terry* stop-and-frisk:

1. Ms. Macon told Lt. Dycus[5] that she witnessed conduct and heard a statement that caused her to suspect drug-related activity.

2. Lt. Dycus knew Ms. Macon to be an experienced, credible dispatcher who would not jump to irrational conclusions.

3. Lt. Dycus reviewed the video, paused it at the point where the hand-to-hand exchange occurred, and saw for himself that the item exchanged resembled the type of small baggie that law enforcement officers know is commonly used to exchange drugs.

4. Based on his training and experience, Lt. Dycus believed the comment "That's fat as hell" was consistent with slang terminology for the quantity and/or quality of whatever the men had exchanged.

5. While Ms. Macon recognized one of the men as a janitor, Lt. Dycus nonetheless found it suspicious that both men were wearing street clothes because there was no reason for a member of the general public to be on the loading dock at Fairbanks Hall.

6. Lt. Dycus recognized that Fairbanks Hall would be an attractive place for drug trafficking because not many people were there after the close of business hours, and local law enforcement agencies that routinely investigate drug crimes were not likely to be looking for drug activity at or inside Fairbanks Hall.

---

[5] Plaintiffs contend that Ms. Macon's statements are inadmissible hearsay, dkt. 54 at 1–2, but Defendants do not offer Ms. Macon's statements for their truth.  Ms. Macon's statements are offered to show Lt. Dycus's course of conduct in deciding to investigate the loading docks exchange and later to exclude Plaintiffs from the property.  Dkt. 48 at 20, 33–34; *see Smith v. McKee*, 598 F.3d 374, 387 (7th Cir. 2010) (recognizing "that statements offered to explain an officer's course of conduct are not hearsay").

7.   While investigating the Fairbanks Hall loading dock, Lt. Dycus and Officer Murphy smelled the distinctive odor of marijuana coming from a gold SUV parked in a maintenance spot.

8.   When the officers first saw Mr. Pendleton and Mr. Banks, they recognized both men from the security video and/or photograph.

9.   Neither man was visibly displaying an IU Health security badge on their person evidencing the authority to be at Fairbanks Hall.

Dkt. 48 at 20–21 (citing dkt. 46-2 at 1–3, 7 (Dycus Aff. ¶¶ 2–16, 38); dkt. 46-4 at 1–2 (White Aff. ¶¶ 5–9); dkt. 46-3 at 1–2, 5–6 (Murphy Aff. ¶¶ 5–9, 30)).  They also argue that Plaintiffs' innocent explanation for the conduct observed on video did not negate the officers' reasonable suspicion "based on the totality of the facts and information known to [them] at the time of the stop."  Dkt. 57 at 4–5.

Plaintiffs respond that Lt. Dycus's "primary reason for stopping" them was the video footage of the loading docks exchange.  Dkt. 54 at 10.  They contend that a reasonable juror could conclude from the footage that the two men unmistakably exchanged a key.  *Id.* at 9–10.  But even if so, that would not mean that Lt. Dycus didn't have reasonable suspicion when he stopped Messrs. Pendleton and Banks.  That's because "[b]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to reasonable suspicion when considered in light of all of the factors at play." *United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019) (quoting *United States v. Baskin*, 401 F.3d 788, 792–93 (7th Cir. 2005)).  Officers may not conduct a *Terry* stop based on only a "hunch," but there is no specific quantum of facts or level of certainty required.  *Lopez*, 907 F.3d at 478.  As long as an

16

officer's reasonable suspicion is "grounded in specific and articulable facts," the decision to stop a suspect will be upheld.  *Id.*  Here, the officers have pointed to facts that, taken together, created reasonable suspicion that a drug transaction took place on the loading docks.  *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011) (explaining that "all of the circumstances known to the officer at the time he stopped the defendant, including information relayed to him by fellow officers and police dispatchers," must be considered to evaluate reasonable suspicion).

Furthermore, while some amount of suspicion may have dissipated while questioning Mr. Pendleton, *see* dkt. 54 at 14, there were still specific, articulable facts underlying the officers' suspicion to stop Mr. Banks.  Mr. Pendleton explained that he was an EMS employee and that he and Mr. Banks had merely exchanged a key on the loading docks.  Dkt. 46-7 at 14–15 (Pendleton Dep. at 56–58).  He also showed the officers a key and denied having or exchanging drugs, which the officers confirmed after searching his person, jacket, and locker.  *Id.* (Pendleton Dep. at 57–59).  However, the officers could not confirm that the key Mr. Pendleton showed them was the item exchanged in the video.  And because Mr. Banks was also in street clothes and did not have an IU Health Badge, the officers reasonably could have questioned whether he had permission to be in Fairbanks Hall.  Thus, the officers still had "some minimal level of objective justification" to stop Mr. Banks when he returned to Fairbanks Hall.  *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

17

Defendants' motion for summary judgment on Plaintiffs' claims that they were unlawfully stopped in violation of the Fourth Amendment is **granted.**

### 2. Frisk of Pendleton and Banks

"Even when a *Terry* stop is justified, whether a frisk is also justified is a separate question." *Lopez*, 907 F.3d at 485 (citing *Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009)). "To justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999).

The officers argue that they had reasonable suspicion to frisk Mr. Pendleton and Mr. Banks based on their suspected involvement in a drug transaction, which is "a crime infused with violence." Dkt. 48 at 22 (quoting *United States v. Gambrell*, 178 F.3d 927, 929 (7th Cir. 1999)). The officers alternatively argue that both men consented to be frisked. *Id.* at 22–23.

Plaintiffs respond that a generalized suspicion of drug trafficking is not enough to justify a frisk under *Terry*, and that the officers lacked individualized suspicion to believe that the Plaintiffs were armed at the time of each search. Dkt. 54 at 14–17. They also contend that neither consented to a search but rather cooperated with the officers' commands. *Id.* at 18–20.

### a. Consent

""[W]here the validity of a search rests on consent, the state has the burden of proving that the necessary consent was obtained and that it was

18

freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." *Florida v. Royer*, 460 U.S. 491, 497 (1983). To determine if consent was voluntary, the "court considers: (1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; and (6) whether he was in custody when he consented." *United States v. Jones*, 22 F.4th 667, 676 (7th Cir. 2022).

### i.  Mr. Pendleton

Defendants designate portions of Mr. Pendleton's deposition as evidence that he consented to being searched. *See* dkt. 48 at 23. But some of those statements, such as when he told the officers they could search his locker and jacket, *id.* (citing dkt. 46-7 at 15 (Pendleton Dep. at 58:15–17)), were made after Officer Murphy had already frisked him. The designated evidence regarding what was said before the frisk—the timeframe that matters for evaluating consent—is consistent. Mr. Pendleton testified that the officers approached him, Officer Murphy asked who he was, and then Officer Murphy stated, "I need to pat you down for our safety, but let's do it inside since its dark outside." Dkt. 46-7 at 14 (Pendleton Dep. at 56); *cf.* dkt. 46-3 at 3 (Murphy Aff. ¶ 19) ("When I saw Mr. Pendleton, I told him that we were conducting an investigation and that we wanted to speak with him, but that we would first need to pat him down for weapons for our safety and his.").

19

Later in Mr. Pendleton's deposition, he described his response to Officer Murphy's statement as follows:

```
                                                        Page 75
1   Q.   Okay.  Did you say anything to him in response?
2   A.   I said, "Okay."  I had no problem with it.  I put
3        my hands up against the wall and let him do his
4        search.  I told him, you know, who I was and, you
5        know, that I work here, you know, so I had my hands
6        on the wall while he was doing the pat-down.
```

Dkt. 46-7 at 19 (Pendleton Dep. at 74–75).

From the designated evidence a jury could reasonably find that Officer Murphy did not ask Mr. Pendleton for permission to conduct a pat-down but rather told him that he was going to conduct a pat-down. *See* dkt. 46-7 at 14, 19 (Pendleton Dep. at 56, 74–75); dkt. 46-3 at 3 (Murphy Aff. ¶ 19). Based on such finding, a reasonable jury could conclude that Mr. Pendleton did not voluntarily consent to a pat-down but that his response was a "mere submission to" Officer Murphy's "claim of lawful authority" to search him. *Royer*, 460 U.S. at 497; *United States v. Nafzger*, 965 F.2d 213, 216 (7th Cir. 1992); *cf. Kaupp v. Texas*, 538 U.S. 626, 631 (2003) (explaining that the defendant's "okay" in response to officer's command was "no showing of consent" because the officer's statement "'we need to go and talk' presents no option but 'to go'").

The officers' focus on Mr. Pendleton's deposition statement—"I had no problem with it"—misinterprets a defendant's burden in proving a valid consent search. Dkt. 57 at 7–8. The officers must "prove[] that the necessary consent

was obtained," not that Mr. Pendleton may have consented if they had asked him at the time. *Royer*, 460 U.S. at 497.

The officers have not shown that Mr. Pendleton voluntarily consented to a pat-down.

### ii. Mr. Banks

Regarding Mr. Banks, there are disputed material facts regarding whether he "freely and voluntarily" consented to the pat-down or if his consent was merely "submission to a claim of lawful authority."   *Royer*, 460 U.S. at 497.  Mr. Banks testified that Officer Murphy said to him: "We need to search you.  We need to pat you down. Is it okay?", and Mr. Banks responded: "Yeah. You-all can search me."  Dkt. 46-8 at 19 (Banks Dep. at 75).  And according to Officer Murphy, he said, "I am going to search you for weapons," to which Mr. Banks responded, "Okay," or "No problem."  Dkt. 46-3 at 6 (Murphy Aff. ¶ 31). Mr. Banks described how he was "compliant" and "did what they told me to do."  Dkt. 46-8 at 20 (Banks Dep. at 78–79).  He explained that, "when the police tell you they need to search you, you are going to put your hands up, so I went and put my hand up against the wall, spread my legs, and they searched me."  *Id.* (Banks Dep. at 79).

Based on the facts and circumstances surrounding the search, a reasonable juror could find that Mr. Banks's acquiescence was "mere submission to" Officer Murphy's "claim of lawful authority" to search him. *Royer*, 460 U.S. at 497. Defendants have not shown that Mr. Banks voluntarily consented to a pat-down.

### b. Reasonable suspicion

Defendants next argue that, regardless of whether Plaintiffs voluntarily consented, the totality of the circumstances presented specific and articulable facts that supported the pat-down. Dkt. 48 at 22. Officer Murphy frisked Mr. Pendleton and Mr. Banks based on his suspicion that they had engaged in a drug transaction on the loading docks. Dkt. 46-3 at 3, 5–6 (Murphy Aff. ¶¶ 17–19, 30–32); dkt. 46-7 at 14–15 (Pendleton Dep. at 56–57). However, "[t]he authority to frisk is not automatic in a drug investigation." *Lopez*, 907 F.3d at 485. Officer Murphy also had to have reasonable suspicion that Plaintiffs may have been "armed and presently dangerous." *Id.*

Defendants have not identified facts that support a reasonable suspicion that Plaintiffs were armed and dangerous. The designated evidence shows that they both immediately complied with the officer's commands, including Mr. Pendleton showing his EMS badge when asked for identification. Dkt. 46-7 at 15 (Pendleton Dep. at 56). There is no evidence that either Mr. Pendleton or Mr. Banks appeared nervous or evasive during this encounter. *Cf. Brown*, 188 F.3d at 865. And while "guns are among the tools of the drug trade," dkt. 48 at 22 (quoting *Gambrell*, 178 F.3d at 929 (7th Cir. 1999)), more than suspicion of an isolated transaction is required to support a frisk under *Terry*, *see Lopez*, 907 F.3d at 485–86. *Cf. United States v. Thompson*, 842 F.3d 1002, 1005–06, 1007 (7th Cir. 2016) (upholding legality of frisk after officers witnessed conduct indicative of a drug transaction during "an ongoing investigation into a drug

trafficking organization").   The officers' motion for summary judgment on Plaintiffs' claim that they subjected them to an unlawful pat-down is **denied**.

### 3. Continued Detention

The officers next argue that their detention of Mr. Pendleton and Mr. Banks lasted no longer than was reasonably necessary to complete their investigation. Dkt. 48 at 24–27.[6]  "[A] *Terry* stop violates the Constitution when an officer 'prolongs the stop, absent the reasonable suspicion ordinarily demanded' by the Fourth Amendment.  When the reasonable suspicion justifying the stop evaporates, the stop must end."  *Id.* (quoting *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)).

There is no bright-line time limit to determine whether a *Terry* stop was unreasonably prolonged.  *Reedy*, 989 F.3d at 553 (citing *United States v. Place*, 462 U.S. 696, 709 (1983)).  Rather, "courts should 'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'"  *Id.* (quoting *United States v. Sharp*, 470 U.S. 675, 686 (1985)).

Mr. Pendleton argues that his detention should have ended after the officers confirmed that IMPD could not provide a K-9 Unit, and that by

---

[6] Mr. Banks responds that the officers never had reasonable suspicion to stop and detain him in the first place, but he does not argue or designate evidence showing that they unreasonably prolonged his detention.  Dkt. 54 at 14.  Because the officers had reasonable suspicion to stop Mr. Banks, they could lawfully detain him for questioning to dispel their suspicion, and the officers' motion for summary judgment on Mr. Banks's unlawful detention claim is **granted**.

detaining Mr. Pendleton in a storage room until his supervisor arrived, the officers turned the *Terry* stop into a "full-blown arrest."  Dkt. 54 at 9–14.

The officers confirmed that an IMPD K-9 Unit was not available around 8:05 p.m.  Dkt. 46-2 at 6 (Dycus Aff. ¶ 36).  Five to ten minutes elapsed between this confirmation and Mr. Banks's arrival.  *Id.* ¶ 37.  In support of the continued detention of Mr. Pendleton, the officers explain it is the policy of the IU Health Police Department to have a supervisor present while investigating the conduct of a contract employee.  *Id.* at 5 (Dycus Aff. ¶ 30); dkt. 46-3 at 4 (Murphy Aff. ¶ 22); dkt. 46-10 at 5 (White Dep. at 14).  But "a police officer's compliance with the rules of his department is neither sufficient nor necessary to satisfy the Fourth Amendment's reasonableness requirement." *United States v. Brown*, 871 F.3d 532, 536–37 (7th Cir. 2017).

Here, Mr. Pendleton had already verified his employment with EMS and thus, his authorization to be at Fairbanks Hall, dkt. 48 at 25, by showing the officers his EMS badge and a key to the building.  He also had provided an innocent explanation for the security footage of the loading docks exchange, and the officers' search of his person, jacket, and locker revealed no evidence of criminal activity.  Thus, a reasonable jury could find that "it was [not] necessary to detain" Mr. Pendleton further.  *Reedy*, 989 F.3d at 553.  The officers' motion for summary judgment on Mr. Pendleton's claim that his detention exceeded the scope of a lawful *Terry* stop is **denied**.

### C. Retaliation

Mr. Pendleton and Mr. Banks allege that the officers unlawfully retaliated against them for having challenged and complained about the officers' conduct. For summary judgment purposes, the parties agree that Plaintiffs' "expression of displeasure with the officers' investigation is protected speech." Dkt. 48 at 29 n.8. Mr. Pendleton's claim is based on Officer Murphy having threatened to arrest him and banning him from the property. Dkt. 54 at 30. Mr. Banks's claim is based on Lt. Dycus's call to Ms. Sells later in the evening when he told her that Mr. Banks would not be allowed to return to his job placement with IU Health. *Id.* at 31.

"'[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). "To prevail on [a First Amendment] claim, a plaintiff must establish a 'causal connection' between the government defendant's 'retaliatory animus' and the plaintiff's 'subsequent injury.'" *Id.* (quoting *Hartman*, 547 U.S. at 259). Establishing a retaliatory motive and a related injury are not enough—the motive "must be a 'but-for' cause, meaning the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Id.*

### 1. Sergeant White and Lt. Dycus

Sgt. White argues that he is entitled to summary judgment on Plaintiffs' retaliation claim because he was not personally involved in the allegedly retaliatory conduct. Dkt. 48 at 30. Lt. Dycus argues that he is entitled to

summary judgment because his allegedly retaliatory conduct was not taken under color of state law.  *Id.* at 30–31.  Plaintiffs' response does not address those arguments, *see generally* dkt. 54 at 29–32, so they have "abandoned the claim[s]," *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008).

Sgt. White and Lt. Dycus's motions for summary judgment on Plaintiffs' retaliation claims are therefore **granted.**

### 2. Officer Murphy

Officer Murphy[7] argues that because he had probable cause to arrest Mr. Pendleton for disorderly conduct and trespass, any retaliatory motive for banning him from IU Health and threatening to arrest him is negated. *See Nieves v. Bartlett*, 139 S. Ct. at 1724; dkt. 57 at 13–15.[8]  Officer Murphy further argues that even if he did not have probable cause to arrest Mr. Pendleton, he is still entitled to summary judgment because Mr. Pendleton was not harmed by Officer Murphy's actions.   Dkt. 57 at 15.

Mr. Pendleton responds that a jury could find that Officer Murphy's actions were retaliatory because he did not do or say anything that warranted being banned from IU Health.  Dkt. 54 at 30.  His actions and speech, including his comments about the officers' conduct, were lawful.  *Id.*  Finally,

---

[7] Mr. Banks has not articulated a theory of liability against Officer Murphy.  *Id.* at 29–32.  Officer Murphy's motion for summary judgment on Mr. Banks's retaliation claim is therefore **granted**.  *Maclin*, 520 F.3d at 788.

[8] Although Officer Murphy argues that Plaintiffs changed their theory of liability against him in their response brief, *see* dkt. 57 at 13, plaintiffs' theory of liability is consistent with the facts pled in their complaint—that the officers excluded them from the property in retaliation for protesting their conduct, *see* dkt. 33 ¶¶ 58, 87–89.

Mr. Pendleton responds that he lost his job as a result of being banned from IU

Health, so a jury could find that he suffered a deprivation. *Id.* at 31–32.

### a. Probable cause

Officer Murphy has designated evidence that Mr. Pendleton was acting

loud and argumentative during the investigation, thus providing probable

cause to arrest him for disorderly conduct.  Dkt. 46-3 at 7 (Murphy Aff. ¶ 38);

*see* Ind. Code § 35-45-1-3(a)(2) (defining disorderly conduct as a "person who

recklessly, knowingly, or intentionally . . . makes unreasonable noise and

continues to do so after being asked to stop").  Additionally, Officer Murphy

points out that Mr. Banks claimed he tried to quiet down Mr. Pendleton.  Dkt.

46-8 at 27 (Banks Dep. at 108).  Officer Murphy contends that he also had

probable cause to arrest Mr. Pendleton for trespass because he refused to

leave.  Dkt. 57 at 14; dkt. 46-3 at 7 (Murphy Aff. ¶¶ 38–40); *see* Ind. Code § 35-

43-2-2(b)(2) (defining trespass as a "person who . . . not having a contractual

interest in the property, knowingly or intentionally refuses to leave the real

property of another person after having been asked to leave by the other person

or that person's agent").

Mr. Pendleton has designated evidence that he did not speak in a loud

and angry voice.  Dkt. 46-7 at 30 (Pendleton Dep. at 118–20).  Thus, there are

material, disputed facts regarding whether Officer Murphy had probable cause

to arrest him for disorderly conduct.  *See Jones v. Webb*, 45 F.3d 178, 182 (7th

Cir. 1995) ("Whether an officer had probable cause to make an arrest generally

will present a question for the jury, although the court can decide it when the material facts are not disputed.").

There are also material, disputed facts regarding whether Officer Murphy had probable cause to arrest him for trespass.  The parties agree that Mr. Pendleton was lawfully on IU Health property for his job, and the only reason Officer Murphy told Mr. Pendleton to leave was in response to Mr. Pendleton's comments about the officers.  *Id.*; dkt. 46-3 at 7 (Murphy Aff. ¶¶ 38–40).  If Officer Murphy had probable cause to arrest Mr. Pendleton for trespass, it would only have been after he refused to leave.  *See* Ind. Code § 35-43-2-2(b)(2).

From these facts, a reasonable juror could infer the 'but-for' causation required to show retaliation—that is, Mr. Pendleton's complaint about the officers' conduct was the only reason Officer Murphy banned Mr. Pendleton from IU Health.  In other words, Mr. Pendleton would not have been banned from IU Health absent Officer Murphy's retaliatory motive.  *Nieves*, 139 S. Ct. at 1722.  A jury could also reasonably find from these facts that when Officer Murphy told Mr. Pendleton to leave, he did not have probable cause to arrest him for trespass. And even if Officer Murphy later developed probable cause, a jury could still reasonably find that Officer Murphy's sole motive for telling Mr. Pendleton to leave was in retaliation for his comments about the officers.

### b. Deprivation

Officer Murphy argues that Mr. Pendleton did not suffer a deprivation as a result of being banned from IU Health.  Dkt. 48 at 32; dkt. 57 at 15.  Officer

Murphy has designated evidence that EMS offered Mr. Pendleton a different job assignment with the same schedule, hours, and pay.  *See* dkt. 46-5.  In response, Mr. Pendleton designates evidence showing that the new assignment was a day-shift position, not a night-shift one, so he could not accept the new job.  Dkt. 53-1 at 2 (Pendleton Aff. ¶¶ 13–17)).

While Officer Murphy contends that Mr. Pendleton's affidavit contains inadmissible hearsay and therefore cannot create an issue of fact, dkt. 57 at 15–16, "[s]tatements introduced to show their effect on the listener, rather than the truth of the matter they assert, are not hearsay."  *Torry v. City of Chicago*, 932 F.3d 579, 585 (7th Cir. 2019).  The statements that Mr. Pendleton attributes to others are admissible to explain why he did not accept the other job.  From this evidence, a jury could conclude that Mr. Pendleton was not offered the same schedule, hours, and pay as his IU Health position.

*      *      *

In sum, a reasonable juror could find that Officer Murphy banned Mr. Pendleton from IU Health for retaliatory reasons and that Mr. Pendleton lost his job as a result.  Officer Murphy's motion for summary judgment on Mr. Pendleton's retaliation claim is therefore **denied.**

### D. Tortious Interference with a Business Relationship

Mr. Pendleton and Mr. Banks allege that the officers and IU Health tortiously interfered with their business relationship with EMS.  To state a claim for tortious interference with a business relationship, a plaintiff must show: "(1) the existence of a valid relationship; (2) the defendant's knowledge of

29

the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with that relationship." *Denman v. St. Vincent Medical Group, Inc.*, 176 N.E.3d 480, 496 (Ind. Ct. App. 2021) (citing *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1235–36 (Ind. 1994)).  Additionally, "this tort requires some independent illegal action." *McCollough v. Noblesville Schs.*, 63 N.E.3d 334, 344 (Ind. Ct. App. 2016).

Sgt. White and Officer Murphy argue that they are entitled to summary judgment because they never communicated with EMS and therefore did not interfere with Plaintiffs' employment relationship. [9]  Dkt. 48 at 34.  All Defendants argue that they are entitled to summary judgment because Plaintiffs have not designated evidence establishing independent illegal conduct, absence of justification, or damages.  *Id.* at 34–36.

Plaintiffs respond that both Officer Murphy and Lt. Dycus—and through them, IU Health—interfered with their employment relationship by excluding them from the property.  Dkt. 54 at 33.  They further contend that the officers' motivation for excluding Mr. Pendleton from IU Health property was unjustified and illegal retaliation, and whether Mr. Pendleton and Mr. Banks were damaged by the officers' actions is a question of fact that must be resolved by a jury.  *Id.*

---

[9] Plaintiffs' response does not address Sgt. White's argument, *see generally* dkt. 54 at 32–34, so they have "abandoned the claim[s]," *Maclin v. SBC Ameritech*, 520 F.3d 781, 788 (7th Cir. 2008).  Sgt. White's motion for summary judgment on Plaintiffs' tortious interference claim is therefore **granted**.

### 1. Independent Illegal Conduct

Officer Murphy contends that, as there was no constitutional violation, there was no independent illegal conduct. The Court previously found, however, that a reasonable juror could find that Officer Murphy banned Mr. Pendleton from IU Health for retaliatory reasons. The question is thus whether a constitutional violation is independent illegal conduct.

This issue of Indiana state law must be decided "as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *H.A.L. NY Holdings, LLC v. Guinan*, 958 F.3d 627, 632 (7th Cir. 2020) (quoting *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002)). Since the Indiana Supreme Court has not decided whether a constitutional violation is independent illegal conduct, the Court will "do[] [its] best to predict how the Indiana Supreme Court would decide" this issue. *Webber*, 923 F.3d at 480–81.

There is not a "definition or test for a showing of the 'illegal conduct' element of tortious interference with a business relationship" claim. *Levee v. Beeching*, 729 N.E.2d 215, 222–23 (Ind. Ct. App. 2000). But the requirement has been "interpreted loosely by Indiana courts, encompassing a broad swath of claims." *Nikish Software Corp. v. Manatron, Inc.*, 801 F. Supp. 2d 791, 797 (S.D. Ind. 2011). "[C]ourts interpreting Indiana law have held that non-criminal illegal acts are sufficient." *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 641 (7th Cir. 1999) (citing cases). Under that view, federal statutory violations, sexual harassment, and the filing of an improper lawsuit

31

have been deemed "illegal conduct."  *Reginald Martin Agency, Inc. v. Conseco Med. Ins. Co.*, 388 F. Supp. 2d 919, 932 (S.D. Ind. 2005) (citing cases); *United States ex rel. Durcholz v. FKW Inc.*, 997 F. Supp. 1143, 1153 (S.D. Ind. 1998).

On the other hand, Indiana courts have found neither defamation, *Levee*, 729 N.E.2d at 222–23; *Melton v. Ousley*, 925 N.E.2d 430, 436 (Ind. Ct. App. 2010), or breach of contract, *Nikish Software Corp.*, 801 F. Supp. 2d at 797–98, to constitute "illegal conduct."

As discussed above, a jury could find that Officer Murphy unlawfully banned Mr. Pendleton from IU Health in retaliation for Mr. Pendleton's protected speech.  Considering the "broad swath of claims" that Indiana courts have found to constitute "illegal conduct," *id.* at 797, the Court concludes that the Indiana Supreme Court would likely find Mr. Pendleton's claim based on violation of a fundamental constitutional right to constitute "illegal conduct."

Therefore, a jury could reasonably find that Officer Murphy engaged in independent illegal conduct against Mr. Pendleton.

On the other hand, Officer Murphy was granted summary judgment on Mr. Banks's First Amendment claim, and Mr. Banks has not offered another theory to establish the element of independent illegal conduct against Officer Murphy.  Officer Murphy's motion for summary judgment on Mr. Banks's claim is therefore **granted**.

Plaintiffs have abandoned their First Amendment claim against Lt. Dycus, and they do not argue that his call to Ms. Sells was independently illegal under a separate theory.  *See* dkt. 54 at 32–33.  Therefore, Plaintiffs

32

cannot satisfy this element of a tortious interference claim against Lt. Dycus, whose motion for summary judgment is **granted**.

### 2. Absence of Justification

Officer Murphy argues that the plaintiffs cannot show an absence of justification because they failed to offer "evidence suggesting" that he "acted *exclusively* to harm the plaintiffs' business interests." Dkt. 57 at 19 (citing *Morgan Asset Holding Corp v. CoBank, ACB*, 736 N.E.2d 12568, 1272 (Ind. Ct. App. 2000)). Mr. Pendleton responds that he was "excluded based exclusively on his protest" of the officers' conduct. Dkt. 54 at 33.

Indiana courts have not consistently applied a uniform standard to show an absence of justification. Some courts have required that the conduct "is malicious and exclusively directed to the injury and damage of another," *see Morgan Asset*, 736 N.E.2d at 1272, while others have looked at whether "the conduct at issue is fair and reasonable" by using factors from the Restatement (Second) of Torts, *see Coca-Cola Co. v. Babyback's Int'l, Inc.*, 806 N.E.2d 37, 49–52 (Ind. Ct. App. 2004). The Indiana Supreme Court recently acknowledged the differing approaches without deciding which is correct. *Am. Consulting, Inc. v. Hannum Wagle & Cline Eng'g, Inc.*, 136 N.E.3d 208, 215 (Ind. 2019). The Court noted that the record in that case contained "conflicting evidence" that showed both that the defendant had "a legitimate business purpose" and that it "targeted [the plaintiff] for an improper purpose." *Id.* As a result, the Court held that "no matter which of the two standards for what constitutes the

absence of justification element . . . there remains an issue of material fact to preclude summary judgment." *Id.*; *see also Denman*, 176 N.E.3d at 497.

So too here.  Regardless of which standard is employed, a reasonable juror could find that Officer Murphy acted without justification.  If a juror were to find that he excluded Mr. Pendleton from Fairbanks Hall as retaliation for engaging in protected speech, then that juror could also find that Officer Murphy acted maliciously for the purpose of injuring Mr. Pendleton and that his conduct was not fair and reasonable.  *Cf. Denman*, 176 N.E.3d at 497 (concluding evidence was sufficient to establish absence of justification where jury could have found that defendant knowingly provided a deficient report that caused plaintiff to suffer employment consequences).

Therefore, a reasonable juror could find that Officer Murphy acted without justification when he excluded Mr. Pendleton from the property.  *Cf. id.*; *Am. Consulting*, 136 N.E.3d at 215.

### 3.   Damages

Officer Murphy argues that Mr. Pendleton cannot establish damages because he was offered a new job from EMS with the same work schedule, hours, and rate of pay.  Dkt. 48 at 35–36.  This argument has already been considered in the context of Mr. Pendleton's First Amendment claim.  As mentioned previously, there is a material dispute as to Mr. Pendleton's ability to find a suitable replacement job.  Therefore, a reasonable juror could find that there was a deprivation resulting from Officer Murphy's allegedly

34

retaliatory conduct, and, thus, could find that Mr. Pendleton was damaged by this interference with his business relationship.

*     *     *

In sum, Mr. Pendleton has designated evidence from which a reasonable juror could find that he established each element of a claim for tortious interference with a business relationship against Officer Murphy, whose motion for summary judgment is therefore **denied**.

## IV.
## Conclusion

Defendants' motion for summary judgment is **granted** as to all claims brought by Mr. Banks, except for his unlawful frisk claim.

Defendants' motion for summary judgment is **granted** as to Mr. Pendleton's claim alleging First Amendment retaliation against Lt. Dycus and Sgt. White.

Defendants' motion for summary judgment is **granted** on Plaintiffs' claim for spoliation of evidence.

Defendants' motion for summary judgment is **denied** as to the following claims brought by Mr. Pendleton: (1) unlawful frisk against the officers; (2) unlawful detention against the officers; (3) First Amendment retaliation against Officer Murphy; and (4) tortious interference with a business relationship against Officer Murphy.

Magistrate Judge Baker is asked to hold a status conference to discuss settlement and trial readiness.

**SO ORDERED.**

Date: 9/6/2022

Distribution:

Terrance Lamont Kinnard
KINNARD & SCOTT
tkinnard@kinnardlaw.net

Pamela G. Schneeman
STEPHENSON MOROW & SEMLER
pschneeman@stephlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

James Patrick Hanlon
United States District Judge
Southern District of Indiana